UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
JANE SPRETER,

    Plaintiff/Counter-Defendant,

      v.

AMERISOURCEBERGEN CORPORATION
and AMERISOURCEBERGEN DRUG
CORPORATION,

    Defendants/Counterclaimants.
```

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 12-2187
        (JEI/KMW)

**OPINION**

**APPEARANCES:**

CONSOLE LAW OFFICES LLC
Stephen G. Console, Esq.
Marjory Albee, Esq.
Caren N. Gurmankin, Esq.
110 Marter Avenue, Suite 105
Moorestown, NJ 08057
            Counsel for Plaintiff/Counter-Defendant Jane Spreter

BLANK ROME LLP
Stephen M. Orlofsky, Esq.
Rachel J. Gallagher, Esq.
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
            Counsel for Defendants/Counterclaimants
            AmerisourceBergen Corporation and AmerisourceBergen
            Drug Corporation

<u>Pro Hac Vice</u>:
BLANK ROME LLP
Larry R. Wood, Esq.
Frederick G. Sandstrom, Esq.
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
            Counsel for Defendants/Counterclaimants
            AmerisourceBergen Corporation and AmerisourceBergen
            Drug Corporation

**Irenas**, Senior District Judge:

This is an employment discrimination and retaliation suit brought by Plaintiff Jane Spreter against her former employer, Defendants AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation (hereafter collectively referred to as "Amerisource"). Spreter's claims under Title VII, 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination are apparently based on many and varied complaints and several alleged adverse employment actions occurring over the last year of Spreter's 30-year employment with Amerisource.

Spreter primarily claims, however, that she was constructively discharged in retaliation for making internal complaints concerning Amerisource's "diversity" hiring policy; and that similarly, as a white female, she suffered discrimination when Amerisource promoted a less qualified female minority employee and a less qualified male minority employee ahead of her.[1]

This Opinion addresses both of Amerisource's summary judgment motions; the first seeking judgment on Spreter's claims, and the second seeking judgment on Amerisource's counterclaims. A separate Order will address a third motion,

---

[1]  Spreter's complaint asserted failure to promote claims as to four separate positions. Now at summary judgment, Spreter only contests two of the four. Accordingly, summary judgment will be granted to Amerisource on the two abandoned claims.

which is Spreter's Motion for Reconsideration of this Court's
Order of April 22, 2014.

For the reasons stated herein, Amerisource's Motion for
Summary Judgment on Spreter's claims will be granted.
Amerisource's Motion for Summary Judgment on its counterclaims
will be granted as to the breach of contract claim and denied as
to the declaratory judgment claim. In light of the disposition
of Spreter's direct case, the declaratory judgment claim will be
dismissed for lack of a live case or controversy.

## I.

### A.

Before setting forth the facts of this case, the Court must
address what is properly considered part of the summary judgment
record in this suit. Spreter's opposition brief sets forth in
table form, a litany of "complaints of discriminatory conduct
and the adverse actions based on the same," consuming almost
three single-spaced pages of her brief. (See Opposition Brief
p. 4-7) The table cites to Plaintiff's Statement of Additional
Undisputed Facts, which in turn, mainly cites to Plaintiff's
deposition and her separate declaration. Of course, only the
deposition transcript and the declaration might be properly
considered; the brief and statement of undisputed facts are not

evidence.[2]  *See generally* Fed. R. Civ. P. 56(c)(1) (stating that

factual assertions must be supported by cites to "particular

parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or

declarations, stipulations . . ., admissions, interrogatory

answers, or other materials.").

---

[2]  In this regard, the Court must note that Plaintiff's Statement
of Additional Undisputed Facts ("SOAF") repeatedly distorts and
misrepresents the facts in the actual record.  To cite just one
of several possible examples, Plaintiff's SOAF ¶ 71 states, "In
around October 2010, Plaintiff complained to Mr. Caffentzis that
he routinely gathered his male direct reports to have lunch with
him, but that female subordinates were routinely excluded from
the same."  In support of this statement Plaintiff's counsel
cites Caffentzis' deposition testimony.  However, Caffentzis'
testimony is vastly different than counsel's characterization of
it.  First, nothing in Caffentzis' testimony supports a finding
of fact or inference that the conversation between Spreter and
Caffentzis ever took place during a specific time period; the
transcript provides no support for the "October 2010" date.
Second, Caffentzis' testimony as to Spreter's asserted
"complaint" was actually this:  "Q:  What's the conversation you
had [with Spreter]?  A: That there were a group of men going out
to lunch together.  Q:  And you would sometimes join them,
right, when you came to [the] Thorofare [office]?  A:  It
depended on what my schedule was.  Sometimes I had lunch out of
the office with people.  Sometimes by myself.  Q:  And when you
would go on those lunches would you ever invite Miss Spreter
along?  A:  I'm not sure if I ever did."  (Caffentzis Dep. p.
324)
      Notably, Spreter testified that she "rarely saw" Caffentzis
in the New Jersey office where she worked because "[h]e worked
often out of either his home, his home in Florida, or at the
corporate office [in Pennsylvania].  So it was, you know, few
and far between when we actually met with him or saw him face to
face."  (Spreter Dep. 176-77)

But in this case, the Court concludes that the sham affidavit doctrine applies, and therefore Spreter's declaration should not be considered in the summary judgment analysis.

"A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of material fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). "The main practical reason supporting the sham affidavit doctrine is that prior depositions are more reliable than affidavits." *Id.*

In opposition to Amerisource's Motion for Summary Judgment on Plaintiff's claims, Spreter's first exhibit is the entire transcript of her day-long deposition, taken on May 30, 2013.[3] The Court has read the entire transcript. Spreter's testimony is replete with generalities and vague references to "complaints" and "concerns" she had. Her testimony rarely

---

[3] The transcript indicates the deposition began at 9:40 a.m. and concluded at 6:30 p.m. (Pl's Ex. 1)

identifies *to whom* she complained or *when* she complained.[4]
Attempts by defense counsel to elicit specific information
proved futile.  For example:

> Q:  Identify for the record the complaint you made
> which resulted in AmerisourceBergeren providing you
> with an offer to transfer to a corporate headquarters
> job in April of 2011?[5]
>
> . . .
>
> A:  There's multiple complaints.
>
> Q:  So you can't identify a single one that was the
> cause of the company offering you a corporate HR job
> in April of 2011?
>
> . . .
>
> A:  Not a single complaint, no.  It was multiple
> complaints.
>
> (Spreter Dep. p. 229-30)[6]

---

[4]  Such facts are essential in an employment discrimination /
retaliation case such as this where who knew what, when is
directly relevant to the issues of causation, pretext and
discriminatory / retaliatory intent.

[5]  As discussed infra, Spreter argues that Amerisource's
transfer offer was an adverse employment action.

[6]  At a different point in her deposition, Spreter was asked to
identify to whom she complained about a Hispanic male being
promoted over her.  Her answer: "I complained to Pedro Veliz.  I
complained to Michelle Bridges.  I complained to June Barry.  I
complained to Meryl Harrari.  I complained to [my direct
supervisor] A.J.  I complained to James Frary.  I complained to
Nicole Carlyle.  I complained to June Bruni.  I complained to my
peers, the HRDs." (Spreter Dep. p. 298-99)

Similarly, when defense counsel asked Spreter for the dates of her multiple complaints, she could not supply a date for most of them.  (See Spreter Dep. p. 296, 299-303)  While Spreter testified that she could provide dates after consulting her "records" (id.), no such documents are to be found in the summary judgment papers before the Court.

Spreter's declaration is an obvious attempt to create concrete claims by identifying specific people to whom Spreter complained and specific time frames in which she complained.  In short, the declaration attempts to fill-in the blanks of Spreter's deposition testimony.

The date of her declaration, May 19, 2014, is significant for two reasons: (1) the declaration was signed almost a year after her deposition, and (2) it was signed on the very same day defense counsel filed Spreter's opposition to Amerisource's summary judgment motion.  Spreter provides no explanation for why, a year later, she was able to provide specific details that she could not provide during her deposition.  Moreover, Spreter has not supported those details with any other record evidence. See Jiminez, 503 F.3d at 108 ("The timing of the affidavit, whether there is a plausible explanation for the contrary statements, and whether there is independent evidence in the record supporting the affidavit may be considered when determining whether an affidavit is a sham.").

Thus, the Court concludes that the declaration was offered solely for the purpose of defeating summary judgment.  The Court rejects Spreter's post-hoc attempt to fill-in the blanks of her deposition testimony.  The declaration will not be considered.

**B.**

*Spreter's retaliation claim*

Spreter began working for Amerisource's predecessor in 1981.  In 1990, she was promoted to Human Resources Director for the East Region, working in Amerisource's Thorofare, New Jersey office.  She held that position until her employment with Amerisource ended on May 6, 2011.  (Spreter Dep. p. 15)

In an "offer letter" dated April 29, 2011, Spreter was given two options: (1) move to a different position in Amerisource's corporate headquarters in Chesterbrook, Pennsylvania, or (2) accept a severance package.  (Pl's Ex. 33) She chose neither option, electing instead to resign without a severance.  Spreter contends that the April 29, 2011 letter-- which she considered an "ultimatum"-- was retaliation for complaints she made about Amerisource's diversity recruiting policy.

It is undisputed that the April 29, 2011 letter came approximately one year after A.J. Cafentzis became Spreter's

direct supervisor as a result of a company-wide management restructuring.

According to Spreter, around the same time that Ceffentzis became her supervisor, she began making complaints about what she believed to be Amerisource's "discriminatory conduct"--i.e., "placing individuals in jobs based on things other than qualifications such as race and sex." (Spreter Dep. p. 57-59)

Sometime in the year prior to Spreter's termination of employment, Spreter "contacted Pedro [Veliz, Amerisource's recruiting manager] to express concern" that Jay Webster was hired for an open Senior HRD position "because he was a male." (Id. p. 83, 295-96)  When further asked at her deposition, "To whom did you make a complaint about naming Jay to the position . . . ?"  Spreter testified, "I complained to Pedro Veliz.  I complained to Michelle Bridges.  I complained to June Barry.  I complained to Meryl Harrari.  I complained to [my direct supervisor] A.J.  I complained to James Frary.  I complained to Nicole Carlyle.  I complained to June Bruni.  I complained to my peers, the HRDs." (Id. p. 298-99)

In an email to Jay Webster, on September 29, 2010, in response to Webster's inquiry as to what Spreter thought of a meeting, Spreter wrote,

> I thought [the] short intro to Diversity was really
> interesting, compelling and heartfelt.  I think we
> are heading in the right direction with the Diversity

> initiative. . . . There were some suggestions made
> about rewarding managers for hiring diversity
> candidates that were concerning but I'm not quite
> sure I heard them correctly. Hopefully if we consider
> something like that we have more discussions before
> implementing.

(Pl's Ex. 20)

Spreter further testified that, "immediately following" that same meeting she "consulted" Amerisource's in-house lawyer, Michelle Conte, "about giving bonuses for hiring diversity candidates and giving bonuses for having a diversified department," and "had numerous conversations with" Amerisource's Chief Diversity Officer about the issue as well. (Spreter Dep. p. 340)

Also at some unspecified time during the last year of Spreter's employment, Spreter and her supervisor, A.J. Caffentzis, had more than one conversation about "bullpen recruiting," which Spreter and Caffentzis both understood to mean holding a "meet and greet" with a large pool of prospective applicants. (Caffentzis Dep. p. 284-85) Caffentzis testified that he expressed his desire to pursue bullpen recruiting but Spreter told him that "it was illegal." (Caffentzis Dep. p. 287) Caffentzis further testified,

> A: I asked [her to explain] why that would be
> illegal for us to do that if we were documenting all
> the candidates that we were seeing, if we were
> following all of our normal business practices but
> trying to shorten the duration of having a vacancy.

10

. . .

Q:   Didn't [Spreter] tell you that practices like
bullpen recruiting could result in discrimination
because a lot of people in power are white males who
are likely to hire individuals who look like them?

. . .

A:  Yes.

(Caffentzis Dep. p. 287-88)

Spreter later told Amerisource's in-house lawyer that
Caffentzis wanted to pursue bullpen recruiting and that she
believed such recruiting could be discriminatory.  (Conte Dep.
p. 91-92)

In January, 2011, during a conference call with
unidentified people, Spreter states that she raised concerns
about a proposed hiring plan which included "committing to a
number" of "diversity hires."  (Spreter Dep. p. 246-47)  A week
later she wrote an email to her supervisor:

AJ,

In answer to your question 'Do you feel like we will
have action steps from the recruiting session?', at
this point I cannot answer for sure.  I raised a
concern on the HRD call last week when it was relayed
that they would be asking each region to 'commit to a
certain number of diversity hires.'   But the
presentation draft that Espy sent me last night
contains similar language.  I've asked Espy to clarify
what the first bullet point is asking or requiring us
to do but I've not heard back from her yet.  My guess
is that this drafted strategy has not yet been
reviewed by legal and would be surprised if it ends
up in the final plan.

(Pl's Ex. 50)

It is undisputed that the presentation draft was later changed to "reflect not a commitment to diversity hires but a commitment to hire the most talented and diverse" workforce. (Pl's Ex. 51; Spreter Dep. p. 255-58)

In April, 2011, after Spreter made the alleged complaints, but before receiving the April 29, 2011 "offer" letter, Caffentzis completed Spreter's annual Performance Evaluation Form. (Pl's Ex. 13)  Spreter received an overall Performance Rating of 2 / "Partially Meets Expectations," on a scale of 4. (Id.)  The 17-page evaluation form is extremely detailed, containing lengthy individualized comments from both Caffentzis and Spreter herself on almost every page.  While Caffentzis criticized Spreter in some respects, he was positive in others. For example, the following "comments" from Caffentzis appear together on the same page:

> Adaptability/Innovation:  The description here calls out: Adapts to change, open to new ideas, identifies creative solutions, solves problems creatively.  None of these describes Jane's perspective, action planning, and daily activities.  Jane has shown an inability to be open to change and will in all cases defer to the 'way we have always done it.'  There is opportunity to look at how we have done things in the past and determine if there are better ways to execute/drive things in the future.
>
> Decision Making/Judgment:  Jane makes solid decisions.  In terms of judgment Jane can continue to work on understanding that she is one of the leaders

of the region and she can continue to drive for change
and results.

Integrity/Ethics:   Jane   has   the   highest   of
integrity/ethics.

(Pl's Ex. 13 at ABC00000386)  Indeed, of the 18 different

categories in which Spreter was rated, "adaptability/

innovation" was the only one where Spreter was rated "Does Not

Meet Expectations."  (Id. at ABC00000388)  In eight categories

Spreter was rated "Fully Meets Expectations" or "Exceeds

Expectations."  (Id.)

Spreter's final comments on her own evaluation state,

This past year has been by far the most difficult of
my career with huge shifts in values and priorities
at the top of the organization, loss of numerous long
time, valued relationships of those exited out of the
organization and/or department, lack of alignment or
misunderstandings about regional strategy, lack of
resources and support at the Corporate HR level and a
concern that we are heading too far in the direction
of a 'spider' organization.

(Pl's Ex. 13 at p. ABC00000389)[7]

Despite Spreter's numerous and very lengthy comments

throughout her evaluation (her own comments were, on average, at

---

[7]  Spreter testified that she preferred the management style of
her former supervisor, who was replaced by Caffentzis. (Spreter
Dep. p. 176-77)  Specifically, she stated, "[my former
supervisor] James did, I think, a great review for all his team.
James was very knowledgeable about sales and the business and
the financial end, and he was an excellent leader in terms of
motivating people.  And A.J. [Ceffentzis] was not at the same
level."  (Id. at p. 177)

least twice as long as Caffentzis'), she made no comments concerning Amerisource's diversity policy, recruiting tactics, or hiring decisions.  (Pl's Ex. 13)  However, Spreter testified at her deposition that, when she discussed her performance review with Jay Webster, Webster told her "that [she] was seen as negative and resistant to change because [she] was not supportive of the diversity program."  (Spreter Dep. p. 55)

In a March 4, 2011 email to Jay Webster, Caffentzis wrote, "Jay, I believe that you were going to work on the new assignment details for Jane.  The time has come for us to make this happen."  (Pl's Ex. 31)

On May 6, 2011, Spreter emailed Caffentzis, "This email is to confirm that I will not be accepting the transfer to Corporate no[r] will I be signing the severance release as I believe the termination of my position and employment is retaliatory and discriminatory."  (Pl's Ex. 36)

*Spreter's failure-to-promote claims*

Spreter asserts Amerisource discriminated against her when Amerisource selected Michelle Bridges, a black female, to fill the newly-created position of Chief Diversity and Inclusion Officer in May 2010; and when Amerisource selected David Navarro, a Hispanic male, to fill the newly-created position of Senior Director, Shared Services.

It is undisputed that Amerisource never posted vacancy announcements for these newly-created positions.

Sperter contends that both Michelle Bridges and David Navarro were less qualified for the positions than she. It is undisputed that Spreter had been employed by Amerisource significantly longer than both Bridges and Navarro.

### C.

Amerisource also asserts two counterclaims. The first seeks a declaration that "Spreter voluntarily resigned from her employment and that Spreter did not suffer an adverse employment action." (Amended Answer ¶65) The facts relevant to that claim have been discussed *supra*.

The second is a breach of contract claim based on Spreter's retention of confidential human resources documents after she left Amerisource's employ. Spreter signed a Confidentiality Agreement that included a covenant not to disclose confidential information:

> While employed by the Company and thereafter, Employee
> shall hold in strictest confidence and shall not,
> directly or indirectly, orally or in writing, disclose
> to any person or entity, or use for the benefit of
> himself/herself or others, any Confidential
> Information (defined below), except in connection
> with and for the benefit of Company's business and in
> strict compliance with Company rules, policies and
> directives, or otherwise as expressly permitted in
> writing by the Company.

(Amended Counterclaim Ex. F)

The Confidentiality Agreement further provides that at the conclusion of Spreter's employment, she was required to return all confidential information and company property in her possession, custody or control:

> 5. Company Property. Employee agrees that Company Property, as defined below, shall remain the sole and exclusive property of the Company during and after the termination of Employee's employment, no matter the reason for such termination and that, upon termination, Employee shall disclose to the Company all Confidential Information and Company Property of which he/she may be aware, and shall return the originals and all copies of all Confidential Information and Company Property in his/her possession, custody or control.

(Amended Counterclaim Ex. F)

Spreter's Answer admits that she retained confidential documents: "Plaintiff had documents related to her job at Defendants at her home as a result of her almost thirty (30) year career with Defendants and the fact that she, at times, worked from home during that period." (Answer ¶ 52, 53)

Similarly, Spreter's brief in opposition to Amerisource's Motion for Summary Judgment on their breach of contract counterclaim admits that Spreter "inadverten[tly] fail[ed] to return company documents that she had brought home over the years she was employed by Defendants, to work on for the benefit of Defendants." (Opposition Brief, p. 26)

16

## II.

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

## III.

The Court addresses Spreter's claims of retaliation and discrimination before turning to Amerisource's counterclaims.

## A.

As previously stated, Spreter brings her retaliation and discrimination claims pursuant to Title VII, § 1981, and NJ LAD. The same legal analysis applies for all three statutes. *Tavarez v. Township of Egg Harbor*, --- Fed. App'x ----, 2014 WL 3467606, at *1 (3d Cir. July 16, 2014) ("Summary judgment motions in § 1981 actions are governed by the [same] burden shifting analysis . . . that [is] generally applied in Title VII cases."); *Brown v. Michaelowski*, Civ. No. 13-4939, 2014 WL 3731336, at *5 (D.N.J. July 28, 2014) (applying the same burden-shifting framework to NJ LAD claims).[8]

## 1.

Amerisource moves for summary judgment on each element of Spreter's retaliation claim.  In particular, Amerisource spends much time arguing that Spreter suffered no adverse employment action because she voluntarily resigned.  According to

---

[8] Because Spreter did not raise her failure to promote claims in her administrative agency complaint, she brings those claims under 42 U.S.C. § 1981 and NJLAD only.  *See Taylor v. Sibs, The Bistro*, 2014 WL 3509777, at *3 (D.V.I. July 15, 2014) ("Before filing suit under Title VII, a plaintiff must exhaust her administrative remedies by bringing a charge with the EEOC.")

Amerisource, the job at corporate headquarters which Caffentzis offered Spreter was a "lateral transfer" that would not alter the terms or conditions of Spreter's employment.  As discussed further *infra*, issues of material fact preclude a finding that Spreter suffered no adverse employment action.  However, Spreter's retaliation claim nonetheless fails because she has not adduced sufficient evidence of retaliatory motive.

In order to establish a prima facie case of retaliation, an employee must show that: (1) she engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the employee's protected activity and the purportedly adverse employment action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

Then, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (internal quotation marks omitted).  If the employer carries its burden, it will be entitled to summary judgment unless the plaintiff produces "some evidence from which a jury could reasonably reach [the] conclusions" both "that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.*

Spreter's evidence fails to call into question the veracity of her supervisor's explanation for proposing that Spreter be

transferred to corporate headquarters.  Caffentzis' evaluation of Spreter noted that Spreter failed to meet expectations with regard to adaptability and willingness to change under Caffentzis' new leadership.  Very shortly thereafter, Caffentzis sought to place Spreter in a position he believed would be a better fit for her--  i.e., a position where she did not report to him.  (Caffentzis Dep. p. 33-34, 48, 51, 55)[9]

Moreover, nothing in the record supports even an inference that Caffentzis sought to transfer Spreter in retaliation for her nebulous, vague, and relatively brief "complaints" as they related to Amerisource's developing diversity policy.[10]  Other than the transfer offer itself-- the nature of which is not so extreme or unusual to independently support an inference of retaliation-- Spreter points to no evidence from which a reasonable factfinder could conclude that Caffentzis was antagonistic to her or harbored animus toward her.  Similarly, viewing the record as a whole, no reasonable factfinder could find the timing of the transfer offer so unusually suggestive as to support an inference of retaliatory motive.

---

[9]  Caffentzis was "the sole decisionmaker" with regard to offering Spreter a transfer or severance.  (Caffentzis Dep. p. 47)

[10]  Spreter's reliance on her own deposition testimony that Jay Webster told her she was seen as resistant to change because of her opposition to certain aspects of the diversity policy fails because it is inadmissible hearsay.

Viewing the all of the facts in the light most favorable to Spreter, and drawing all inferences in her favor, no reasonable factfinder could conclude that Caffentzis had a retaliatory motive.  Accordingly, Amerisource is entitled to summary judgment as to the retaliation claim.

## 2.

Similarly, as to the failure to promote claims, Spreter's evidence cannot support a finding that Spreter's gender, or Michelle Bridges and David Navarro race and gender, were the reasons she was not promoted.

To establish a *prima facie* case, Spreter must produce evidence that she (1) is a member of a protected class[11]; (2) is qualified for the position; (3) was not hired for the position; and (4) defendant failed to hire her under circumstances giving rise to an inference of unlawful discrimination.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

---

[11] When a non-minority is alleged to be the victim of discrimination, so-called reverse discrimination cases, the first prong of the analysis is replaced with the requirement that plaintiff put forward "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." *Thompson v. Bridgeton Bd. of Educ.*, 9 F. Supp. 3d 446, 455 (D.N.J. 2014); *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999).

The summary judgment record fails to support an inference that unlawful discrimination motivated Amerisource's hiring decisions.  The mere fact that the selected candidates were of a different race or gender as Spreter, of course, is insufficient.

Spreter argues that a reasonable factfinder could infer a discriminatory motive from the undisputed fact that neither position was "posted."  According to Spreter, a reasonable juror could conclude that the selection of Michelle Bridges and David Navarro for their respective newly-created positions was pre-ordained.  But even if Amerisource admitted that it created specific positions for specific employees (which it has not in this case), it would not support an inference of discrimination in view of the facts of this case.

Spreter's reliance on Amerisource's exploration of diversity recruiting policies and its stated desire to increase diversity in its workforce cannot raise an issue of disputed fact as to Amerisource's discriminatory motive.  Spreter points to nothing in the record connecting this generalized desire to achieve more diversity within the company to the specific decisions made with respect to Michelle Bridges and David Navarro.  Indeed, Spreter does not even identify who the relevant decisionmakers were.

Spreter fails to adduce sufficient evidence of discriminatory intent to raise an issue of material fact

requiring resolution by a jury.  Accordingly, summary judgment
for Amerisource is warranted.


**B.**

The Court briefly discusses Amerisource's declaratory
judgment claim before turning to the breach of contract claim.


**1.**

In a retaliation suit, an adverse employment action is
anything that "well might have dissuaded a reasonable worker
from making or supporting a charge of discrimination."
*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 64
(2006).

A reasonable factfinder could conclude that effectively
forcing Spreter out of her current position, and giving her no
choice to remain in the New Jersey office where she had worked
for over 20 years, might dissuade a reasonable worker from
supporting a charge of discrimination.  Viewing the record
evidence in the light most favorable to Spreter, a reasonable
factfinder could conclude that the April 29, 2011 letter was, as
Spreter contends, an "ultimatum": accept the transfer, or sign a
release of all your claims and accept a severance.  By putting
Spreter in a position of having to choose between these two
options, a reasonable factfinder could conclude that

Amerisource's actions could have made a reasonable worker think twice before making a charge of discrimination.  The fact that Spreter thereafter chose to quit and pursue litigation rather than accept one of the two options does not change the Court's conclusion.

Amerisource's Motion for Summary Judgment on its declaratory judgment claim, seeking a declaration that Spreter suffered no adverse employment action, will be denied.  In light of the disposition of Spreter's direct claims, however, the declaratory judgment claim will be dismissed for lack of a live case or controversy.

## 2.

As stated *supra,* Spreter admits that she retained confidential Amerisource documents after her employment terminated.  Nonetheless, she argues that: (1) Amerisource is "selectively enforcing" the confidentiality agreement in retaliation for Spreter's protected activity (including filing this lawsuit); (2) that the Confidentiality Agreement's forum selection clause selects Chester County, Pennsylvania as the "exclusive venue" for litigation concerning breaches of the agreement, therefore, by filing the counterclaim in this Court, Amerisource has materially breached the agreement; and (3)

Amerisource has suffered no damages as a result of Spreter's breach.

All three arguments fail.

The Court addressed Spreter's first argument when it granted Amerisource's Motion to Dismiss Spreter's amended retaliation claim based on the breach of contract counterclaim. In any event, Spreter's first argument is not a legally cognizable defense to a breach of contract claim, and therefore it fails here.

Second, violation of a forum selection clause is not a material breach of contract under Pennsylvania law. *See Gillard v. Martin,* 13 A.3d 482 (Pa. Super. Ct. 2010) (defining material breach as a "breach . . . so substantial as to justify an injured party's regarding the whole transaction as at an end.").[12]  The "remedy" for violation of a forum selection clause is not a breach of contract action, but rather a Motion to Transfer Venue.  Spreter has made no such motion.

Lastly, Spreter's damages argument fails because Amerisource does not exclusively seek money damages for breach of the confidentiality agreement.[13]  It also seeks "equitable

---

[12]  The Confidentiality Agreement provides that it is governed by Pennsylvania law.

[13]  By arguing that nominal damages for breach of contract are available under Pennsylvania law, Amerisource has implicitly admitted that it has not suffered any actual damages.

relief as permitted, including, an order requiring Plaintiff to return Defendants' property and restraining and enjoining Plaintiff from continuing to violate her Confidentiality Agreement." (Amended Answer and Counterclaims, Prayer for Relief, ¶ B)

The above-discussion of Spreter's arguments notwithstanding, the Court notes that Spreter's admitted breach of the Confidentiality Agreement appears to be inadvertent; or at least there is nothing in the record supporting an inference that Spreter retained the confidential documents with the intent to use them to her advantage-- indeed, to "use" them at all-- either in this lawsuit or for some other reason.  To the extent Spreter's selective enforcement and damages arguments are implicitly based on Spreter's contention that she merely possessed documents at her house because she sometimes worked from home over the course of her 30 year employment with Amerisource, a reasonable factfinder could agree.  However, lack of intent is not a defense to a breach of contract claim, therefore Amerisource's Motion for Summary Judgment on its breach of contract counterclaim will be granted; the Court will direct Spreter to return to Amerisource all confidential documents.

**IV.**

For the above-stated reasons, Amerisource's Motion for Summary Judgment on Spreter's claims will be granted in its entirety; Amerisource's Motion for Summary Judgment on its Counterclaims will be granted as to the breach of contract claim and denied as to the declaratory judgment claim.  The declaratory judgment claim will be dismissed for lack of a live case or controversy.  An appropriate Order accompanies this Opinion.


October 30, 2014

                              ___s/ Joseph E. Irenas_____
                              Joseph E. Irenas, S.U.S.D.J.